## UNITED STATES DISTRICT COURT
## DISTRICT OF SOUTH CAROLINA
## CHARLESTON DIVISION

| | |
|---|---|
| EDWARD ANGELO BONALDI, ) | |
| ) | |
| Plaintiff, ) | C/A No. 2:15-cv-344-PMD-MGB |
| ) | |
| v. ) | |
| ) | |
| ALLISON-SMITH COMPANY, LLC and ) | **ORDER** |
| INTERNATIONAL BROTHERHOOD OF ) | |
| ELECTRICAL WORKERS LOCAL 776, ) | |
| ) | |
| Defendants. ) | |

The Plaintiff, Edward Angelo Bonaldi, brought this action against Defendants Allison-Smith Company LLC ("A-S") and the International Brotherhood of Electrical Workers Local 776 ("Local 776"). This matter is before the Court Local 776's Motion for Summary Judgment (Dkt. No. 145) and A-S's Motion for Summary Judgment (Dkt. No. 146). Plaintiff filed responses to both Motions. (Dkt. Nos. 152 and 156) Local 776 and A-S each filed a reply (Dkt. Nos. 157 & 158).

This action arises out of Plaintiff's employment and discharge as a journeyman wireman at projects in Moncks Corner and North Charleston. In March 2014, the employer, A-S, and the union, Local 776, entered into a collective bargaining agreement that covered employees at the projects, including Plaintiff. Plaintiff alleges that A-S breached the collective bargaining agreement when it discharged him without proper cause and failed to re-hire him in July 2014, and that Local 776 breached its duty of fair representation when he grieved the termination and was rejected for re-hire. Plaintiff alleges that Local 776 violated its duty of fair representation by making an inadequate and perfunctory investigation and presentation of his grievance. For the

reasons that follow, the Court concludes as a matter of law that Plaintiff cannot establish that Local 776 breached the duty of fair representation. The Court therefor grants the Motions.

## BACKGROUND

On March 1, 2014, A-S (an electrical contractor) and Local 776 entered into the "Inside Construction Agreement," a collective bargaining agreement, and its supplement, the Small Works Addendum ("collective bargaining agreement" or "CBA"). The CBA covered the electrical work on a construction project A-S oversaw called the MNK project in Moncks Corner, South Carolina. ("MNK project"). (Dkt. No. 146-2 at 171–72.) During the same time period, A-S was also overseeing a second area project at the Charleston International Airport (the "CIA Trip project"). Plaintiff, a member of Local 776, accepted a union referral to perform electrical work at the MNK project on July 11, 2014; the call was for two weeks to an indefinite time period. (*Id.* at 35–36.)[1]

### A.     Plaintiff's Employment and Termination

Plaintiff worked on the MNK project from July 14 to July 24, 2014. (Dkt. No. 146-2 at 35–36.)[2] He performed such tasks as installing junction boxes, wiring terminal boxes, relocating bus plugs, adjusting mounting brackets, and terminating wire. (*Id.* at 127.) On July 24, Plaintiff completed a project adjusting brackets. (*Id.* at 122.) An A-S representative handed Plaintiff a termination notice stating he was being let go that day due to a reduction in force. (*Id.* at 129–30.) A-S asserts that Plaintiff was laid off on July 24, an action which was within the total discretion of A-S under the CBA; Plaintiff alleges that he was discharged without cause, in

---

1.     Local 776 is a party to the CBA with the South Carolina Division, Atlantic Coast Chapter of the National Electrical Contractors Association. ("ACC NECA"). ACC NECA is a contractors' association that represents electrical contractors in collective bargaining with various local unions in North Carolina, South Carolina and parts of Virginia. (Dkt. No. 145-1 at 8 & n.2.)  A-S is a member of ACC NECA. (Dkt. No. 146-2 at 1-2.)

2.     Unless otherwise noted, all subsequent dates referenced in this Order passed in the year 2014.

violation of the CBA. (Dkt. No. 1 at 5, 11; Dkt. No. 146-2 at 171–72.)[3] Plaintiff was the only person laid off that day, but A-S undertook six other lay-offs before July 24. (Dkt. No. 145-3 at 125; Dkt. No. 146-11 at 3–4.)

Upon receiving the termination notice, Plaintiff called Local 776's office to see if there were any other jobs available. The office informed him that there were two calls, including one at the MNK project for a journeyman wireman. (Dkt. No. 1 at 9.) Plaintiff asked for that job, but A-S rejected him for a second employment. (*Id.*) That same day, Plaintiff sought and spoke to the business manager for Local 776, Chuck Moore, to inform him of his report of safety concerns and how odd it was for him to be laid off in the morning. Plaintiff complained to Mr. Moore that his foreman did not know about the lay-off and that the union steward told him that others were laid off with him. (*Id.* at 9–10.) Plaintiff alleges that Mr. Moore did nothing to investigate the situation and told him that A-S had the right to lay him off and reject him without a reason. (*Id.* at 10.) Plaintiff alleges that he told Mr. Moore at that time that he wanted to file a grievance because he thought the lay-off was pre-textual. (*Id.*)

Later on July 24, Plaintiff accepted a call from the other regional A-S project, the CIA Trip project. After filling out the appropriate paperwork, Plaintiff was told to report on Monday morning. (*Id.* at 10.) When Plaintiff did so, he was handed another termination notice. (*Id.*) Plaintiff returned to the union hall looking for Moore, but was told Moore was out of town. Plaintiff also checked job openings and noticed there was still one for the MNK project. (*Id.*) Plaintiff checked again for available jobs on the MNK project and was told on July 31 that he was again rejected. (*Id.* at 11.)

---

3.  A-S takes the position that it could discharge an employee without cause. (Dkt. No. 146-1 at 3–5.) Local 776 takes Plaintiff's position that A-S could not discharge an employee without cause. It argued that position at Plaintiff's grievance hearing. (Dkt. No. 157 at 8 n.5; Dkt. No. 145-8 at 127.)

3

Plaintiff submitted a grievance to Local 776, alleging he was not laid off but instead was improperly fired for complaining about workplace safety violations. (*Id.*) Local 776, through Moore, investigated the grievance and represented Plaintiff at the grievance hearing. (Dkt. No. 1 at 14–18.) Plaintiff's claim was rejected by the Labor-Management Committee who heard the grievance on August 28, 2014. (Dkt. No. 145-8 at 91.)

The two basic questions in Plaintiff's breach of contract cause of action are: 1) whether A-S laid off Plaintiff or instead discharged him without cause; and 2) whether the CBA gave A-S the right to discharge employees without cause. Plaintiff argues he was improperly terminated in retaliation for reporting safety concerns and violations of policy and procedure and safety concerns. (Dkt. No. 1 at 12; Dkt. No. 152 at 3–4.)[4] A-S asserts Plaintiff was terminated because "Plaintiff had just completed an assignment, had worked primarily on short-term projects during his brief employment, was not thought to be as productive as other journeymen wiremen, and was a member of a smaller, more interchangeable crew." (Dkt. No. 146-1 at 8 (citing Hicks Decl., Dkt. No. 146-11, at 3–4.) The MNK project supervisor, Scott Hicks, has stated that he did not know about any alleged safety concerns/incidents until he received a letter from Plaintiff's on July 28, after his decision to terminate Plaintiff on July 24. (Dkt. No. 146-11 at 4.)

### B. Plaintiff's Grievance

Plaintiff alleges that Local 776, through Moore, inadequately represented him by failing to investigate his grievance adequately, by failing to call certain witnesses at the grievance hearing, and by failing to represent him zealously at that hearing. (Dkt. No. 152 at 4–5.) Local

---

4. Before July 24, Plaintiff complained to A-S twice about policy violations and safety concerns. On July 19, Plaintiff complained that another employee violated the Clean Room Policy that required workers to avoid certain activities which could produce dust, particles, vapors, smokes or fibers inside a designated clean room ("Clean Room incident"). (Dkt. No. 146-2 at 67.) The same day, upon leaving the clean room, Plaintiff complained that another employee failed to perform an inspection on a scissor lift before using it, which Plaintiff thought was an OSHA violation ("Scissor Lift incident"). (*Id.* at 78–87.) Plaintiff reported both incidents to Brandon Blackmon, A-S's safety supervisor, and Clyde King, an A-S foreman. (*Id.*)

776 asserts that Mr. Moore did thoroughly investigate the grievance, despite difficulties dealing with Plaintiff and his attorney, and did represent Plaintiff adequately at the grievance hearing. (Dkt. No. 145-1.)

As mentioned, Plaintiff first complained to Moore on July 24, the day he was first terminated and rejected for re-employment at MNK. (Dkt. No. 1 at 9–10; Dkt. No. 145-2 at 4.) They discussed the propriety of A-S rejecting Plaintiff for the second MNK position, despite the fact that the termination slip stated he was eligible for rehire (Dkt. No. 146-1 at 136); Plaintiff's fears of being "blackballed" from A-S, as he had been by other large electrical contractors in the area (Dkt. No. 146-1 at 138–40); and his concerns about the management of the MNK project and A-S's treatment of him (Dkt. No. 146-2 at 141–42). Moore told Plaintiff he believe the CBA gave A-S the right to reject any applicant without explanation. (*Id.*) Plaintiff asked Moore to contact Hicks. (*Id.* at 140–41.) Plaintiff and Moore discussed filing a grievance and whether Plaintiff should take the open position at the CIA Trip project. (*Id.* at 141–42.) Plaintiff asserts that during this initial conversation, he formed a belief that Moore was acting in bad faith because Moore was not very sympathetic to Plaintiff's situation. (*Id.* at 191.)

Moore went out of town on July 26 to attend a conference, so he did not immediately investigate Plaintiff's concerns about the MNK project. (Dkt. No. 145-2 at 4–5.) Plaintiff visited the union hall on July 28 after receiving the termination notice for the CIA Trip project, but was told that Moore was out of town at a training seminar. (Dkt. No. 146-2 at 150–52.) After leaving the union hall, Plaintiff left Moore a "pretty fuming" voicemail message on Moore's cell phone about the second lay-off and requested that Moore contact him only by email so there would be a record of their conversations. (Dkt. No. 146-2 at 308–10; Dkt. No. 145-2 at 91.) Moore was out of town at his training conference until August 2 and did not immediately respond to Plaintiff's

5

voicemail. (Dkt. No. 145-2 at 5.) But Moore did begin to investigate the circumstances of the lay-offs; Moore contacted the shop steward for the MNK project, Don Howard, during a break at his conference. (*Id.* at 7.)

That same evening, Moore received a letter from Plaintiff's lawyer, also addressed to Hicks, stating that Plaintiff's lay-off was an "egregious and pre-textual attempt" by management to terminate Plaintiff without cause and in violation of the CBA, alleging that Local 776's representation to date was "wholly ineffective, unconcerned and unfair," and requesting forwarding information for Plaintiff's grievance. (Dkt. No. 145-2 at 99–100.)

Moore responded on July 31, stating that only Local 776 could file a grievance and asking that Plaintiff follow established rules by reporting the violation allegations to Moore directly. (Dkt. No. 145-2 at 104.) Plaintiff, his attorney, and Moore then exchanged several emails that day. The attorney emailed Moore, stating that she was not trying to file the grievance but wanted to ensure that Local 776 was not allowing any deadlines to expire—which might, she asserted, expose the union to litigation for unfair representation—and that Plaintiff's "efforts to get his union representatives to act in a timely manner were well documented." (*Id.* at 100.) Plaintiff also wrote Moore on July 31, complaining about his lay-offs and stating that "[w]e have been weakened enough without the Union failing to stand up . . . . I certainly do not want to sue the Local 776. . . . Take this opportunity to make 'The Right Choice.'" (*Id.* at 112.) Moore responded with an email stating that he was still out of town, that he was responding in a timely manner and requesting that Plaintiff make an appointment to meet with him on Monday, August 4. (*Id.* at 115.)

After numerous attempts by Moore to get the Plaintiff to meet with him, on August 5, Plaintiff emailed Moore to say that he could not meet with Moore because he had left South

6

Carolina. (Dkt. No. 146-2 at 238–39; Dkt. No. 145-2 at 121.)[5] Plaintiff asked Moore for a grievance form to fill out himself. (Dkt. No. 145-2 at 121.) That same day, Moore provided the grievance form. Plaintiff emailed and mailed Moore a copy of his grievance. (Dkt. No. 145-2 at 128; Dkt. No. 145-3 at 5.) After reviewing the 106-page grievance, Moore filed it via email on August 7. (Dkt. No. 145-3 at 3; Dkt. No. 145-3 at 4 *Id.* at 110.)

Under the CBA, the parties have forty-eight hours from the filing of a grievance to resolve it informally. Plaintiff consented to Moore's request for an extension of the informal resolution period, which was granted. (Dkt. No. 145-3 at 3, 112.) Although Plaintiff disputes whether the grievance was filed correctly, there is no dispute that the grievance was considered properly and timely filed, and was heard by the appropriate body. (Dkt. No. 145-3 at 112–17.) The attempt to informally resolve the grievance failed. (Dkt. No. 145-8 at 64–65.)

As Moore investigated the grievance and prepared for the hearing, he kept a contemporaneous summary of his investigation, which he called the "living document," and provided it to Plaintiff prior to the hearing on August 26. (Dkt. No. 145-3 at 131, 135–42.) In addition, Moore has filed a sworn declaration describing his investigation of, and preparation for, Plaintiff's grievance. Although Plaintiff has expressed skepticism about the accuracy of Moore's account of the investigation, he has not provided any *evidence* to dispute Moore's declaration.

Moore spoke with eight witnesses about Plaintiff's claims:

1)   Moore spoke with Local 776 steward and A-S employee Don Howard by phone and in person regarding Plaintiff's layoffs, rejections, and complaints multiple times, including on July 28, 29, and 31 and on August 6 and 9. Moore asked Howard speak to anyone with knowledge of the Clean Room incident. Howard reported back to Moore about those conversations. (Dkt. No. 145-2 at 7; Dkt. No. 145-2 at 91–96.)

---

5.   In addition, this email accused Moore of playing "games" with Plaintiff, covering his "own a[--]," and not committing in writing that Plaintiff's grievance had merit. (Dkt. No. 145-2 at 121.) The failure of the union to commit to the merits of Plaintiff's case is a continuing theme throughout Plaintiff's brief. (*See generally* Dkt. No. 152.)

  2)  Moore spoke with Hicks on July 29 and on August 1, 4, 6, 11, and 22. (Dkt. No. 145-2 at 7, 91–96.)

  3)  Moore spoke with Local 776 steward and A-S employee John Anzalone on July 30 and on August 14 and 15 regarding Plaintiff's termination from the CIA Trip project. (*Id.*)

  4)  Moore spoke with A-S superintendent Mike Stowe about Plaintiff's termination from the CIA Trip project. (*Id.*)

  5)  Moore spoke with A-S field operations senior manager Mike Peters about Plaintiff's claims on August 1, 6, 7, 11, 15, and 18. (*Id.*)

  6)  Moore spoke with ACC NECA representative Larry Moter multiple times about Plaintiff's claims, including August 7, 9, 10, 13, 18, 19, 20 and 22. (*Id.*)

  7)  Moore spoke with A-S employee Kyle Campbell on August 20 regarding the Clean Room incident. (*Id.*)

  8)  Moore spoke with King about the Clean Room incident. (*Id.*)

Moore also reviewed the A-S termination notices for the MNK project issued from July 11 to August 12 to investigate Plaintiff's claim that his purported layoff was a pretext for a termination without cause. He collated the notices and created a chart showing the dates, reasons (i.e., layoff, discharge, voluntary resignation) and classifications for thirty-five journeyman wiremen and three apprentices whose employment at MNK project ended during that period. (Dkt. No. 145-2 at 7, 8; Dkt. No. 145-3 at 124–26.)

  At Plaintiff's request, Moore reluctantly gave his opinion about the grievance in an email on August 15. (Dkt. No. 145-3 at 128.) Moore stated that "I have been reluctant to provide my opinion because you have repeatedly questioned my impartiality in this matter and my ability to process your grievance fairly." (*Id.*) Moore's opinion was that he was unsure the grievance had merit and expressed his reasoning. Moore also gave Plaintiff a brief overview of some of the witnesses he had interviewed. (*Id.*) Despite his uncertainty about the merits, Moore stated "what

I believe or not believed [sic] is not important. I still do my job and go forward with everything that I can. . . . I felt there was enough for [Plaintiff] to have his day." (Dkt. No. 145-10 at 21–22.)

As Moore was investigating the grievance and preparing for the hearing, Plaintiff made a number of requests that Moore provide certain documents and information. Moore responded to those requests, providing Plaintiff:

1) a copy of Local 776's Code of Excellence (Dkt. No. 145-3 at 145–47);

2) the names of the individuals serving on the Labor-Management Committee who were to hear Plaintiff's case (*Id.* at 149–51);

3) all referral forms for the MNK and CIA Trip projects for July 11 to August 5 (*Id.* at 168–90);

4) all rejection forms for the MNK and CIA Trip projects for July 11 to August 5 (*Id.* at 192–99);

5) all termination forms for the MNK and CIA Trip projects for July 11 to August 5 (*Id.* at 201–215);

6) all call forms from A-S for the MNK and CIA Trip projects for July 11 to August 5 and one additional call form (*Id.* at 217–30, 232–37);

7) Local 776's dispatch and referral procedures (*Id.* at 153–56);

8) the name of the individual who signed and provided Plaintiff's July 24 termination notice (*Id.* at 158–60);

9) Plaintiff's verifiable hours (*Id.* at 162–66);

10) additional termination forms for the MNK and CIA Trip projects (Dkt. No. 145-8 at 3–7);

11) additional termination, call, and referral forms for the MNK and CIA Trip projects. (*Id.* at 9–19);

12) by overnight delivery and email, documents previously provided that were hard to read (Dkt. No. 145-4 at 3–98);

13) documents provided by A-S at Plaintiff's request (Dkt. No. 145-6 at 3–29; Dkt. No. 145-7 at 3–45); and

9

> 14) additional information about the number of electricians employed at MNK and CIA Trip projects the day Plaintiff was terminated (Dkt. No. 145-8 at 21–22).

Throughout Moore's investigation of Plaintiff's claims, Plaintiff continued to question Moore's abilities to fairly process and present the grievance. (Dkt. No. 145-8 at 24–27; Dkt. No. 145-2 at 9; Dkt. No. 145-8 at 59–60; Dkt. No. 145-8 at 67–68.) After Plaintiff's August 9 email, Moore responded on August 13, denying that the Local 776 had breached its duty of fair representation, correcting some perceived factual mistakes, clarifying the grievance process, updating Plaintiff on the status of the grievance and informing Plaintiff of the hearing date. (Dkt. No. 145-8 at 31–34.) In addition, Moore stated:

> Although I believe that I am fully capable of processing and presenting your grievance on your behalf, I would like to offer you and/your attorney, Noemie Collie, the option of presenting your grievance at the August 28th meeting of the Carolinas Small Works Labor-Management Committee. Please advise me as soon as possible if you and/or your attorney would like to present your grievance. If you would like to make the presentation, I will send an e-mail to the Chairman and Secretary of the Labor-Management Committee seeking their permission.

(*Id.* at 32.) Plaintiff's counsel told Local 776's counsel that she would like to accept that offer, but the Labor-Management Committee denied the request. (Dkt. No. 145-8 at 38; Dkt. No. 145-8 at 64.)

On August 25, Moore and Plaintiff spoke by phone for over an hour to prepare for the hearing. (Dkt. No. 146-2 at 313; Dkt. No. 145-2 at 10.) Moore explained to Plaintiff that he had obtained a statement from Campbell concerning the Clean Room incident and that Campbell's testimony was not favorable so he did not plan to introduce it into evidence; Moore emailed Plaintiff a copy of the statement.[6] (Dkt. No. 145-2 at 10; Dkt. No. 145-3, 119–22.) On August

---

6. Campbell stated while he was performing a task assigned to him by his building foreman, Clyde King, Plaintiff approached him "with a horrible attitude" and using "an extreme amount of profanity." Plaintiff challenged Campbell's work and King's authority and declared he would "see them walk both of their a—es of[f] the site." (Dkt. No. 145-3 at 120–21.) Plaintiff describes the encounter with Campbell as "perfectly pleasant" and denies cursing. (Dkt. No. 146-2 at 77–78.)

10

27, Moore sent a written outline of the questions he planned to ask Plaintiff at the hearing and what documents he intended to introduce. (Dkt. No. 145-8 at 78–84.) Plaintiff requested that additional questions be added. (Dkt. No. 145-8 at 86–87.) Moore met briefly with Plaintiff before the hearing on August 28. (Dkt. No. 145-2 at 11.)

The Labor-Management Committee would not allow the hearing to be transcribed, instead preparing minutes of the meeting. (Dkt. No. 145-8 at 92; Dkt. No. 145-8 at 92–97.) Moore prepared an outline he used at the hearing. According to the outline:

1) Moore stated the grounds for the grievance ("Labor contends that Mr. Bonaldi's lay-off was unjustified and was actually a termination without cause");

2) Moore explained the relevant issues and the timeline of events;

3) Moore argued that the evidence already presented "demonstrates that [Plaintiff] was not laid off because of a reduction in force. It is clear that the work on the project was ongoing. . . . It appears [Plaintiff] was laid off because of his actions on the job site."

4) Moore presented Plaintiff as a witness;

5) Moore summarized the case. ("[Plaintiff's] testimony shows that he was laid off because Allison-Smith was unhappy with his presence on the job site, not because the job was completed or because of a reduction in force. [Plaintiff's] subsequent rejection for the MNK Project and his lay-off at the CIA Trip project were simply a continuation of that improper lay-off."); and

6) Moore presented various exhibits: pertinent calls, referrals, layoff slips, and rejections for the MNK project; all MNK project calls since July 24 showing that A-S continued to hire; his summary of MNK referrals, layoff slips, and rejections for the MNK project; a summary of MNK terminations since July 24; a copy of the Clean Work program; a full copy of Plaintiff's grievance, referred to as the "Bonaldi Packet"; and documents relating to Plaintiff's hiring and terminations.

(Dkt. No. 145-2 at 11–12; Dkt. No. 145-8 at 127–131.)

The minutes of the committee state that Moore presented the grievance; presented the Bonaldi Packet, which was incorporated into the minutes; Plaintiff testified; Moore concluded his presentation; Plaintiff distributed a spreadsheet of requested remedies; two individuals

11

presented A-S's position; the committee members questioned both parties; the committee deliberated; and the committee denied the grievance finding "no violation of the agreements in this instant case." (Dkt. No. 145-8 at 92–93.) The official letter denying the grievance was dated September 3. (*Id.* at 91.)

## STANDARD OF REVIEW

Summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "Facts are 'material' when they might affect the outcome of the case, and a 'genuine issue' exists when the evidence would allow a reasonable jury to return a verdict for the nonmoving party." *News & Observer Publ'g Co. v. Raleigh-Durham Airport Auth.*, 597 F.3d 570, 576 (4th Cir. 2010) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). In ruling on a motion for summary judgment, "'the nonmoving party's evidence is to be believed, and all justifiable inferences are to be drawn in that party's favor.'" *Id.* (quoting *Hunt v. Cromartie*, 526 U.S. 541, 552 (1999)); *see also Perini Corp. v. Perini Constr., Inc.*, 915 F.2d 121, 123–24 (4th Cir. 1990).

## APPLICABLE LAW

Section 301 of the Labor-Management Relations Act ("LMRA"), 29 U.S.C. § 185, allows an individual to bring suit against an employer for breaching a collective bargaining agreement. The National Labor Relations Act ("NLRA") states that the union representatives "shall be the exclusive representatives of all the employees in such unit for the purposes of collective bargaining." 29 U.S.C. § 159(a).

> The federal labor laws, in seeking to strengthen the bargaining position of the average worker in an industrial economy, provided for the selection of collective bargaining agents with wide authority to negotiate and conclude collective-bargaining agreements on behalf of all employees in appropriate units, as well as

12

>  to be the employee's agent in the enforcement and administration of the contract. . . . .
>      . . . Necessarily [a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents . . . . The unions' broad authority . . . is "undoubted," but it is not without limits.

*Hines v. Anchor Motor Freight, Inc.*, 424 U.S. 554, 563–64 (1976) (internal citations and quotation marks omitted).

A party bringing a § 301 action must show both that the employer breached the agreement and that his union breached its duty of fair representation when representing him in the grievance of the breach. *Thompson v. Aluminum Co. of Am.*, 276 F.3d 651, 656 (4th Cir.), *cert. denied*, 537 U.S. 818 (2002). A § 301 claim is a hybrid action against both the employer, for breach of the collective bargaining agreement, and the union, for breach of its duty of fair representation. *Id.* An individual employee prevails on a § 301 claim only if the union is "given the opportunity to act on behalf of its member before he may proceed on his own." *Amburgey v. Consolidation Coal Co.*, 923 F.2d 27, 29 (4th Cir. 1991) (citation omitted). The scope of judicial review of an arbitration of a collective bargaining agreement is "among the narrowest known to the law." *U.S. Postal Serv. v. Am. Postal Workers Union, AFL-CIO*, 204 F.3d 523, 527 (4th Cir. 2000) (citing *Union Pac. R.R. v. Sheehan*, 439 U.S. 89, 91 (1978)).

Plaintiff bears the burden of proving both that A-S violated the collective bargaining agreement and that Local 776 breached its duty of fair representation. *See Chauffeurs, Teamsters & Helpers, Local No. 391 v. Terry*, 494 U.S. 558, 564 (1990); *Thompson*, 276 F.3d at 651, 656. The claims are interlocked and "neither is viable if the other fails." *Thompson*, 276 F.3d at 657. The "indispensable predicate" for a § 301 claim is the demonstration that the union breached its duty of fair representation. *United Parcel Serv., Inc. v. Mitchell*, 451 U.S. 56, 62 (1981); *Thompson*, 276 F.3d at 656–57.

The duty of fair representation is inferred from the unions' exclusive statutory authority to represent all members of a designated unit. *Vaca v. Sipes*, 386 U.S. 171, 177 (1967). The duty is "a statutory obligation to serve the interests of all members without hostility or discrimination toward any, to exercise its discretion with complete good faith and honesty, and to avoid arbitrary conduct." *Id.* at 177 (citing *Humphrey v. Moore*, 375 U.S. 335, 342 (1964)). The burden is on Plaintiff to show that the union's conduct is "arbitrary, discriminatory, or in bad faith." *Id.* at 190. To be arbitrary, a union's conduct must be so far outside a wide range of reasonableness that it is "wholly irrational." *Thompson*, 276 F.3d at 657. As the Fourth Circuit has stated:

> The resolution of a grievance under a contractually established scheme is ordinarily final and binding on the parties. In order to overturn the committee's decision, [a plaintiff] must establish that the union handled his grievance perfunctorily or in bad faith and that there is substantial reason to believe that a union breach of duty contributed to an erroneous outcome in the contractual proceedings. Simple negligence, ineffectiveness, or poor judgment is insufficient to establish a breach of the union's duty. Rather, the union's conduct must be grossly deficient or in reckless disregard of the member's rights.

*Ash v. United Parcel Serv., Inc.*, 800 F.2d 409, 411 (4th Cir. 1986) (citations and quotation marks omitted). Mere negligence does not constitute unfair representation, but the breach need not be intentional. *Carpenter v. W. Va. Flat Glass, Inc.*, 763 F.2d 622, 624 (4th Cir. 1985). "When the evidence does not tend to establish the severely deficient union conduct required for a breach of the duty of fair representation, summary judgment is appropriate." *Id.* at 412.

## **ANALYSIS**

Even in the light most favorable to Plaintiff, the facts and the inferences reasonably drawn therefrom do not show a triable claim that Local 776 breached its duty of fair representation. As the recitation above demonstrates, Moore engaged in a thorough investigation of Plaintiff's grievance, communicated with and accommodated Plaintiff during that investigation, and then presented a developed case for Plaintiff at the hearing. The Court cannot

14

see how a reasonable jury could interpret Moore's conduct as arbitrary, discriminatory, irrational, grossly deficient, reckless, or beset by bad faith. *See Perini Corp.*, 915 F.2d at 124 ("[T]o grant summary judgment the court must determine that no reasonable jury could find for the nonmoving party on the evidence before it." (citation omitted)).

Plaintiff complains that Moore did not file a grievance immediately upon his first discharge on July 24. Plaintiff argues that "whether it was timely filed or not is debatable, as had a grievance been initiated on July 24, 2014, it is highly unlikely Allison-Smith would have taken the action it did on July 28, 2014." (Dkt. No. 152 at 14 n.7.) The record does not support Plaintiff's argument. It is undisputed that the grievance was filed in accordance with the collective bargaining agreement. The grievance was heard by the committee, conclusively establishing the timeliness issue. Similarly, Plaintiff offers no evidentiary support for his contention that, had Moore filed a grievance before July 28, A-S would not have terminated him from the CIA Trip project.

As mentioned, Plaintiff asserts that Moore's investigation and presentation were not sufficiently thorough. However, Moore investigated Plaintiff's claim that he was targeted for termination without cause for reporting the Clean Room incident and the Scissor Lift incident. During the investigation, Moore spoke with several witnesses about those incidents and with other relevant personnel. Moore discussed with the witnesses the facts and whether these events impacted A-S's decision to discharge Plaintiff or its subsequent decisions not to hire him at the MNK or the CIA Trip projects. Moore also instructed Howard to investigate Plaintiff's claims and report back to him.

A-S was not disputing Plaintiff's versions of the Clean Room incident and the Scissor Lift incident, and Plaintiff testified to his account of the incidents at the hearing. A-S's main

15

contention was that it was entitled to conduct lay-offs and that Plaintiff *was* laid off. Plaintiff, through Moore, asserted he was fired in retaliation for complaining about the Clean Room incident and the Scissor Lift incident. Moore adequately investigated this dispute and all the circumstances surrounding Plaintiff's discharge. In addition to speaking with the eight witnesses, Moore investigated Plaintiff's claims by obtaining and analyzing A-S documents about ongoing lay-offs at the MNK project. Moore prepared a chart showing that Plaintiff was the only person laid off on July 24, and showing the lay-offs surrounding July 24. Moore obtained many other documents requested by Plaintiff and sent all the documentary information he received to Plaintiff before the hearing. Plaintiff submitted his own packet of information to the grievance committee and testified fully at the hearing. There is nothing in the record, other than Plaintiff's speculation, to indicate that more people should have been interviewed or that doing so would have changed the outcome of the grievance hearing.[7]

Although emails between Plaintiff and Moore show they did not have a very cordial relationship, Moore did in fact provide updates on his investigation and preparation for the hearing throughout the thirty-six days before the hearing. The record contains at least fifty emails concerning the grievance. Plaintiff requested that Moore provide him with certain documentation, hundreds of pages in length, so that Plaintiff could assist in the preparation of the grievance. As listed above, Moore cooperated and provided Plaintiff numerous documents. Additionally, Plaintiff had prepared, and Moore provided to the committee, Plaintiff's own version of his grievance.

---

7. This case is distinguishable from *Carpenter*, in which the Fourth Circuit held that a union breached its duty by failing to interview or call plaintiff's doctor when the main issue was whether plaintiff was physically able to work. *See* 763 F.2d at 625. In this case, there is no evidence that any further testimony would have changed the outcome of the hearing.

Moore and Plaintiff spoke for over an hour the night before the hearing in preparation. Moore prepared and provided to Plaintiff an outline of his presentation before the hearing. In response to Plaintiff's frequent allegations of inadequate representation, Moore provided to Plaintiff his "living document," which contained a list of the witnesses Moore had contacted and summaries of their conversations. Although Plaintiff claims some of that information was relayed to him just before the hearing, no reasonable jury could view that as rising to the level of Local 776 breaching its duty. Moreover, Plaintiff has not shown in any specific way how the outcome of the hearing would have been different had he known that information earlier.[8]

Plaintiff urges the Court to consider the substance of the investigation, not just the amount of work Moore did. (Dkt. No. 152 at 4.) The Court has done so, and the record flatly contradicts Plaintiff's assertion that Moore's efforts were qualitatively poor. For example, Moore's "living document" has been examined closely, and contrary to Plaintiff's assertion that it "tells the story of unfair representation," the Court finds that, even in the light most favorable to Plaintiff, it demonstrates that Moore engaged in extensive, good-faith efforts to investigate Plaintiff's grievance thoroughly. Other evidence in the record, such as Moore's hearing outline, show nothing but an earnest effort to substantiate Plaintiff's accusations.

Plaintiff argues that Moore's presentation was inadequate. He claims that Moore failed to argue that the grievance had merit. Moore's script, which Plaintiff describes as "fairly accurate" (Dkt. No. 146-2 at 332–33), states right at the beginning that Plaintiff was terminated improperly and without cause. (Dkt. No. 145-8 at 127). The union did argue Plaintiff's position. Moore elicited testimony from Plaintiff about the facts supporting his and the union's position that the lay-off was improper. (Dkt. No. 146-2 at 319–20.) Plaintiff claims that Moore argued "without

---

8. Even Plaintiff admits that it was unlikely that Moore could force any witnesses from A-S to admit A-S terminated him for complaining about safety problems. (Dkt. No. 152 at 38).

17

enthusiasm that it was [Plaintiff's] belief there had been a violation of the contract." "Without enthusiasm" is a conclusory opinion, not evidence. The script used by Moore belies the assertion that Moore only presented Plaintiff's belief, and not the union position: "Labor contends that [Plaintiff's] lay-off was unjustified and was actually a termination without cause." (Dkt. No. 145-8 at 137.)

Plaintiff next challenges Moore' decision not to call Campbell, the person involved in the Clean Room incident. As part of his investigation, Moore interviewed and got a statement from Campbell, who said Plaintiff acted in a profane, aggressive, and disrespectful manner. Based on that, Moore made the reasonable determination that Campbell's testimony was more likely to hurt Plaintiff's claim. Although Plaintiff disputes that he acted in such a manner, Moore cannot be called unreasonable or unfair for not calling a witness who would likely put Plaintiff in a bad light with the committee resolving Plaintiff's grievance.

Finally, Plaintiff argues that Local 776 and A-S colluded to allow A-S to violate Plaintiff's rights under the CBA. (Dkt. No. 152 at 30–31.) Plaintiff bases this argument on three facts. First, Local 776 forwarded to A-S by email Plaintiff's background check form, identification documents, and OSHA card after his termination on July 24 because the union was referring Plaintiff for a second job. Plaintiff contends Local 776 sent the email in order to warn A-S that Plaintiff was being referred for a second job at the MNK project so that A-S could reject Plaintiff before he even appeared at the job site. However, Local 776 has provided evidence that forwarding the email was a customary practice followed in every referral to the MNK and CIA Trip projects. (Dkt. No. 145-2 at 3–4; Dkt. No. 145-11 at 6–9.)

Second, Moore sent a copy of Plaintiff's grievance to A-S and ACC NECA but not to labor members of the Labor-Management Committee. (Dkt. No. 146-2 at 192–93.) Local 776 has

18

provided evidence that it is standard practice to send a grievance to the employer and NECA (Dkt. No. 145-2 at 6), and that there would be no reason to send a grievance directly to people who might be on the hearing committee (Dkt. No. 145-10 at 11–12.).

Third, Mike Peters, the A-S senior field manager, sent an email to Moore to call him concerning Plaintiff. Local 776 has provided evidence that discussions about pending disputes and grievances is consistent with the standard grievance resolution process in which Moore collects facts about the grievance and discusses possible resolutions of the grievance. (Dkt. No. 145-2 at 6.)  These facts, on their face and in light of the explanations of Local 776's standard practices, do not create a triable issue of fact as to whether that Local 776 and A-S conspired or colluded against Plaintiff.

## CONCLUSION

For the foregoing reasons, the Court concludes there is no genuine issue of material fact as to whether Local 776 breached its duty to Plaintiff and that Defendants are entitled to judgment as a matter of law on that claim.  Because the claim for breach of the CBA is interlocked with the claim for breach of the union's duty of fair representation, both causes of action fail. Therefore, it is **ORDERED** that both motions for summary judgment are **GRANTED**.

**AND IT IS SO ORDERED.**

PATRICK MICHAEL DUFFY
United States District Judge

**March 23, 2017**
**Charleston, South Carolina**